**Supreme Court**

No. 2011-378-C.A.

(P2/10-979 AG)

State                          :

v.                          :

John H. Silva.                          :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                          :

v.                          :

John H. Silva.                          :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**   The defendant, John H. Silva, appeals from a judgment of conviction on six criminal counts relating to a shooting.  On appeal, the defendant contends that, in denying his motion for a new trial, the trial justice overlooked and misconceived material evidence and failed to draw the appropriate inferences from the evidence presented.  Specifically, he posits that the testimony of two of the key witnesses at trial—Ramon Jimenez and John Nazario—was not credible.  The defendant further argues that the verdict was against the fair preponderance of the evidence and failed to do substantial justice between the parties. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

On the evening of December 22, 2009, Ramon Jimenez and Ambiorix Tiburcio were shot and injured while they sat in a parked Honda Civic on Alexander Street in Cranston.  After an investigation of that shooting, on March 25, 2010, the state filed a criminal information charging defendant with respect to his alleged involvement in the shooting.  He was charged with two

- 1 -

counts of assault with a dangerous weapon in violation of G.L. 1956 § 11-5-2 (Counts One & Two); two counts of discharging a firearm during a crime of violence in violation of G.L. 1956 § 11-47-3.2(b)(2) (Counts Three & Four); carrying a handgun on his person without a license in violation of § 11-47-8(a) (Count Five); and discharging a firearm within a compact area in violation of § 11-47-50 (Count Six).

In March of 2011, a jury trial was held in Providence County Superior Court. We summarize below the salient aspects of what transpired at that trial.

## A

### The Evidence at Trial

### 1. The Testimony of Ramon Jimenez

Ramon Jimenez, one of the two victims of the December 2009 shooting, testified through an interpreter. He stated that, on the evening of December 22, he had met his friend Ambiorix Tiburcio at a liquor store on Dexter Street in Providence. Mr. Jimenez stated that the purpose of this meeting was to deliver a green Honda Civic, which Mr. Tiburcio had purchased from him. Mr. Jimenez further testified that he and Mr. Tiburcio then drove in the Honda to another liquor store on Reservoir Avenue; they entered the liquor store and stayed for approximately a half-hour. Mr. Jimenez added that they thereafter drove the short distance to the home of Mr. Jimenez's sister on Alexander Street in Cranston, where he parked the car in front of her home.

It was Mr. Jimenez's testimony that, while he and Mr. Tiburcio were still sitting in the parked Honda, a white BMW X5[1] pulled up alongside the Honda so that the passenger side of

---

[1]     Fred Rios, the owner of Fred's Auto House in Warwick, testified that he performed repairs on a white 2002 BMW X5 registered to one Larissa Jarrett in December of 2009 after having provided an estimate over the phone to a man identifying himself as "John Silva." Mr. Rios further testified that he completed the repairs to the BMW, which had been towed to his place of business from another repair facility, on December 22 and that a man also identifying

- 2 -

the BMW was alongside the driver's side of the Honda. Mr. Jimenez, who was seated in the driver's seat of the Honda, stated that he began rolling down his window and observed that the window on the passenger side of the BMW was rolled down. Mr. Jimenez testified that he saw a person in the BMW who said "Yo" and then "started shooting." He further testified that one of the bullets hit him in the left arm and another hit him in the left leg. It was also Mr. Jimenez's testimony that he recognized the shooter as a man whom he had known for four or five years; he added that he knew that person by the name "Black."

Mr. Jimenez testified that, when the police arrived at the scene of the shooting, he told them that a man named "Black" who "lived on Narragansett" had shot him and that the shooter was driving a white BMW; he added that, while he was in the rescue vehicle, the police told him that they believed the man known to Mr. Jimenez as "Black" was actually "John Silva." It was Mr. Jimenez's testimony that he also told the police that, when he and Mr. Tiburcio had been standing outside the Reservoir Avenue liquor store earlier on that evening, he had seen the same white BMW pass by him driving "very, very slow[ly]."

Mr. Jimenez further testified that, while he was at Rhode Island Hospital later on that evening, he identified "Black" as defendant out of a photo array provided to him by the police. That photo array was entered into evidence at trial as a full exhibit. At trial, Mr. Jimenez also identified the man known to him as "Black" as defendant.

With respect to defendant's motive, Mr. Jimenez testified that, on December 24, two days after the shooting, he told Officer Lee Sohn that he had sold defendant a black Ford F-150 pick-up truck but that defendant had never completely paid for that vehicle. In response to a question posed to him on cross-examination, Mr. Jimenez stated that he "[didn't] think" that he told the

himself as "John Silva" picked up the vehicle on the afternoon of that day. In his testimony, Mr. Rios described the man who picked up the vehicle as being a heavy-set black man.

- 3 -

police that defendant had shot at him because he had "played around with" a woman whom defendant had dated and that defendant was "jealous."

### 2. The Testimony of Ambiorix Tiburcio

Ambiorix Tiburcio, the other victim of the shooting, also testified through an interpreter; his testimony was largely consistent with that of Mr. Jimenez with respect to the events at issue. Mr. Tiburcio stated that, approximately one minute after he and Mr. Jimenez arrived in front of the home of Mr. Jimenez's sister and, while they were both still sitting in the car, a white BMW "Jeep"[2] with tinted windows pulled up alongside the Honda. Mr. Tiburcio testified that he told Mr. Jimenez to look at the BMW; he added that Mr. Jimenez (who had been driving) then began to roll down the driver's window of the Honda while the window on the passenger side of the BMW was descending. According to Mr. Tiburcio's testimony, he saw a black man inside the BMW who said "Hey, yo" or "Yo" and then started shooting at them; however, he could not provide any additional identifying details with respect to the shooter. He testified that one of the bullets hit him in the left arm and another hit him in the left leg.

### 3. The Testimony of Officer Lee Sohn

Officer Lee Sohn of the Cranston Police Department testified that, on the evening of December 22, 2009, he responded to a dispatch informing him that shots had been fired near Alexander Street. Officer Sohn testified that, after arriving at the scene of the shooting, he spoke to Mr. Jimenez while Mr. Jimenez was lying on the ground near the Honda. He stated that he asked Mr. Jimenez if he knew who had shot him and that Mr. Jimenez described the shooter as a black male driving a white BMW that he characterized as an SUV. Officer Sohn stated that Mr. Jimenez also told him that the man who shot him was named "Black."

---

[2] It is clear from the context that the testifying witness (or his interpreter) used the word "Jeep" as a synonym for an SUV.

It was Officer Sohn's testimony that, when he visited Mr. Jimenez in the hospital on the day after the shooting, Mr. Jimenez told him that the shooting may have stemmed from a "jealousy thing." At trial, he stated that he did not know if the shooting "had to do with a girl," but he acknowledged that he had written the following in his police report: "Jimenez could not provide me with any information with regards to this girl or why [Mr. Silva] would be jealous." The officer added that Mr. Jimenez also told him that defendant may have shot at him "over the sale of a truck."

### 4.  The Testimony of Detective Warren Henseler

Detective Warren Henseler of the Cranston Police Department testified that he heard the police dispatch concerning the shooting and that he responded to Alexander Street. Detective Henseler testified that, while speaking to Mr. Jimenez in the rescue vehicle, he asked him who shot him. He further testified that Mr. Jimenez replied "Black;" he said that he then asked Mr. Jimenez if the man who shot him was named "John Silva."[3] According to Det. Henseler, the BMW allegedly used in the shooting was located in April of 2010 at Greenville Auto Sales in Johnston.[4]

### 5.  The Testimony of John Nazario

John Nazario also testified at trial. Mr. Nazario testified that he was a friend of the defendant, whom he also knew by the name "Black." At the time of trial, Mr. Nazario was in

---

[3]     Officer Sohn, who was also present in the rescue vehicle at the time of the conversation referenced in the text, testified that Mr. Jimenez replied "Black" and that Mr. Jimenez also gave the name "John Silva;" he added that Det. Henseler never prompted Mr. Jimenez as to what name to provide to the police.

[4]     Gary Salzillo, who rented a space to sell cars at Greenville Auto Sales, testified that, in December of 2009 or January of 2010, a man whom he knew as "Black" contacted him regarding the sale of a white BMW belonging to "some girl;" but he added that he did not know who had brought the BMW to the Auto Sales site.

federal custody, and he testified pursuant to a plea agreement. According to the terms of the plea agreement, Mr. Nazario pled guilty to federal charges relating to the distribution of crack cocaine and, in consideration of his cooperation in the prosecution of defendant, the United States Attorney agreed to recommend a reduced sentence for those offenses.

At trial, Mr. Nazario stated that, in 2009, he recalled seeing defendant driving, among other vehicles, a white BMW. It was Mr. Nazario's testimony that, in late December of that year, he met defendant at defendant's home. He also testified that defendant called him approximately a week after that meeting and asked him if he "wanted to clean a car," as he had previous experience cleaning cars, and he agreed to do so. Mr. Nazario further testified that defendant picked him up in a rental car and that, while they were driving to purchase cleaning supplies, he asked defendant, "[I]s this the car that I think it is[?]" To that question, defendant replied, "Yes." Mr. Nazario stated that they then drove to the home of defendant's father, where he saw a white BMW parked on the grass directly behind the house; he added that one would not have been able to observe the car until reaching the back of the narrow driveway.

Mr. Nazario testified that he began to clean the car and that defendant instructed him to clean the passenger side. Mr. Nazario stated at trial that defendant replied in the affirmative when he asked him if the BMW which was being cleaned was the same BMW as was involved in the shooting in Cranston. It was Mr. Nazario's further testimony that he asked defendant to show him how he had fired the gun so that he would know where to remove the gunpowder residue; he said that defendant responded by stating that his left hand had been on the steering wheel and that he had used his right hand to fire the gun out the passenger window of the car. Mr. Nazario added that he, therefore, concentrated on cleaning the area from the middle console

over to the passenger side of the BMW and that he knew how to remove gunpowder residue as a result of his having consulted Google.

Mr. Nazario stated that defendant picked him up again on the day after the first cleaning and that he then proceeded to clean the BMW more thoroughly than the first time. According to Mr. Nazario's testimony at trial, defendant told him to clean the front passenger side door, specifically instructing him to take the door apart so that he might access the inside of the door with an air compressor in order to remove the gunpowder residue. Mr. Nazario stated that he cleaned the BMW four or five more times in total.

Mr. Nazario acknowledged on cross-examination that, when he first met with the police after being arrested on April 15, 2010, he told them that during the Winter defendant had been involved in the shooting of two men in Cranston. He further acknowledged on cross-examination that he also told the police on April 15 that, after the shooting in Cranston had occurred, he drove with defendant to a car dealership in Johnston[5] to "drop off the BMW" because defendant "knew he had to get rid of [it] * * * ." Mr. Nazario then signed his plea agreement on September 24, 2010. Subsequently, on November 1, 2010, Mr. Nazario again met with the police and provided more specific details with respect to defendant's involvement in the shooting, including the fact that the shooting took place in December of 2009. However, Mr. Nazario testified that he was aware that the shooting had occurred in December of 2009 the first time he met with the police; when explaining why he did not disclose the date of the shooting until the second time he met with the police, Mr. Nazario stated: "April 15th was not when I was supposed to be telling the truth and the whole truth. That's not when I signed the [plea

---

[5] At trial, Mr. Nazario identified the picture of the white BMW seized by the police from Greenville Auto Sales, which had been entered into evidence as a full exhibit, as being the same one that he had cleaned and driven to the car dealership.

agreement]." He further testified that he did not give his "complete statement" at the first meeting because he was "scared;" he added that "after that signed deal was put in place, [he] just wasn't scared anymore."

**B**

**The Jury Verdict and the Subsequent Motion for New Trial**

On March 24, 2011, the jury found defendant guilty on all six counts. Subsequently, on April 1, 2011, defendant moved for a new trial; defendant argued that the jury misconstrued evidence that was presented at trial, specifically with respect to the testimony of Mr. Jimenez and Mr. Nazario, and that a new trial should be granted in the interests of justice. The trial justice denied the motion.

The trial justice sentenced defendant on May 19, 2011 as follows: 1) on Counts One and Two, defendant was sentenced to two concurrent terms of twenty years imprisonment, ten years to serve; 2) on Counts Three and Four, defendant was sentenced to two concurrent terms of twenty years, with fifteen years to serve, to run consecutively to Counts One and Two; 3) on Count Five, defendant was sentenced to a term of five years suspended, with probation, to run concurrently with Counts One and Two; and 4) on Count Six, defendant was sentenced to one year to run concurrently with Counts One, Two, and Five.

The defendant filed a timely appeal to this Court. On appeal, defendant challenges only the trial justice's denial of his motion for new trial.

**II**

**Analysis**

On appeal, defendant contends that the trial justice erred when he denied the motion for a new trial because, in defendant's view, the trial justice overlooked and misconceived material

evidence and failed to draw all appropriate inferences from the evidence presented; defendant focuses his argument on what he characterizes as the lack of credibility of the witnesses at trial, specifically Mr. Nazario and Mr. Jimenez. The defendant further submits that the verdict was against the fair preponderance of the evidence and failed to do substantial justice between the parties.

When deciding whether to grant or deny a motion for new trial, "the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." State v. Clay, 79 A.3d 832, 841 (R.I. 2013) (internal quotation marks omitted); see also State v. Gonzalez, 56 A.3d 96, 102 (R.I. 2012); State v. Karngar, 29 A.3d 1232, 1235 (R.I. 2011). In passing on a motion for new trial, "the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." State v. Espinal, 943 A.2d 1052, 1058 (R.I. 2008) (internal quotation marks omitted); see also State v. Morales, 895 A.2d 114, 121 (R.I. 2006). If, after conducting this three-step analysis, "the trial justice concludes that reasonable minds could differ as to the result or if the trial justice reaches the same conclusion as the jury did, the verdict should be affirmed and the motion for a new trial denied." Espinal, 943 A.2d at 1058 (internal quotation marks omitted); see also State v. Day, 925 A.2d 962, 984 (R.I. 2007). If, however, the trial justice disagrees with the verdict or "does not agree that reasonable minds could differ, then the trial justice must determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice." State v. Harrison, 66 A.3d 432, 445 (R.I. 2013) (internal quotation marks omitted); see also State v. DeOliveira, 972 A.2d 653, 665 (R.I. 2009).

This Court has stated that the "record should reflect a few sentences of the justice's reasoning on each point[,] * * * [but] the trial justice need not refer to all the evidence supporting the decision * * * ." State v. Banach, 648 A.2d 1363, 1367 (R.I. 1994). The trial justice "need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." State v. DiCarlo, 987 A.2d 867, 870 (R.I. 2010) (internal quotation marks omitted); see Banach, 648 A.2d at 1367.

In conducting our review, "we accord great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling." Harrison, 66 A.3d at 445 (internal quotation marks omitted); see State v. Texieira, 944 A.2d 132, 140-41 (R.I. 2008). Accordingly, this Court "will not overturn a trial justice's determination with regard to such a motion unless we determine that the trial justice committed clear error or that he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." Texieira, 944 A.2d at 141 (internal quotation marks omitted); see Gonzalez, 56 A.3d at 102.

It is clear from the record that, before ruling on the motion, the trial justice completed each of the three analytical steps that are called for when a trial justice is presented with a motion for a new trial. We are satisfied that the trial justice considered the evidence in light of the jury charge and that he then independently evaluated the evidence and weighed the credibility of the witnesses. In the course of summarizing the testimony of Mr. Jimenez and Mr. Nazario, he expressly noted that "this case, like so many others, centered on the credibility of the witnesses," specifically the credibility of Mr. Jimenez and Mr. Nazario, whose testimony he considered to be "truly determinative of the outcome" in the case. The trial judge stated that he found both Mr. Jimenez and Mr. Nazario to be "extremely credible" and that the "jury rightly found them, as

[he] did, to be trustworthy witnesses." It was also his determination that Mr. Nazario and Mr. Jimenez were subject to "severe and exhaustive" cross-examination on their prior criminal records and other issues. Importantly, the trial justice stated that the jury still chose to "credit their testimony." Moreover, according to the trial justice, all of the state's other witnesses, "generally, and in some fashion, supported or corroborated something of what Jimenez and Nazario had related" at trial. He further stated, "As a front row observer, I am well satisfied that the jury's confidence in their testimony was not at all misplaced."

This Court affords a "substantial amount of deference to [the] determinations" of the trial justice with respect to credibility of the witnesses. See DeCiantis v. State, 24 A.3d 557, 572 (R.I. 2011) (quoting B.S. International Ltd. v. JMAM, LLC, 13 A.3d 1057, 1062 (R.I. 2011)). On appeal, defendant is essentially asking this Court to second-guess the trial justice's credibility determinations.

With respect to the testimony of Mr. Jimenez, defendant asserts that he was not a credible witnesses because: 1) his testimony with respect to defendant's motivation for carrying out the shooting was vague and inconsistent; and 2) his testimony that he was able to identify defendant as the man inside the BMW was, in defendant's opinion, contradicted by the testimony of Mr. Tiburcio, who could only discern that the person inside the BMW was a black male. Mr. Jimenez testified that he turned towards the BMW in order to lower the window of the Honda so that he could see who had parked next to him. It was well within the trial justice's role, as the thirteenth juror, to accept the testimony of Mr. Jimenez that he recognized defendant as the person who shot him through the lowered window of the BMW, despite his inability or unwillingness to clearly explain defendant's motivation for doing so. Furthermore, it has been our judgment on more than one occasion that "the presence of some inconsistencies between or

among utterances of a witness or witnesses at different points in time does not ipso facto render the testimony unworthy of belief." State v. Jensen, 40 A.3d 771, 781 (R.I. 2012); see, e.g., State v. Rosario, 35 A.3d 938, 948–49 (R.I. 2012); State v. Shepard, 33 A.3d 158, 164 (R.I. 2011).

With respect to the testimony of Mr. Nazario, defendant argues that his testimony was not credible in light of the timing of his disclosure of evidence that tended to incriminate defendant. The trial justice was entitled to believe Mr. Nazario's testimony that defendant asked him, as a friend who had experience cleaning cars, to help him clean the BMW but that he did not disclose the full extent of his knowledge of defendant's involvement in the shooting until after he had signed his plea bargain because he was "scared." This Court has repeatedly stated that "[t]he mere fact that [a] defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for new trial." State v. Ferreira, 21 A.3d 355, 367 (R.I. 2011) (internal quotation marks omitted); see also State v. Rivera, 987 A.2d 887, 903 (R.I. 2010).

Upon concluding his analysis, the trial justice stated: "[The] verdicts were well supported by the testimony, and I am easily satisfied that John Silva is guilty as the verdicts reflect and his guilt was proved beyond all reasonable doubt on all counts." That determination is a significant consideration in this Court's review of a denial of a motion for new trial; we have consistently held that, if after conducting the required three-step analysis the trial justice agrees with the jury's verdict, "then the inquiry is at an end and the motion for a new trial should be denied." State v. Guerra, 12 A.3d 759, 765 (R.I. 2011); see State v. Bunnell, 47 A.3d 220, 232 (R.I. 2012); State v. Heredia, 10 A.3d 443, 446 (R.I. 2010). Nothing in the record leads us to conclude that the trial justice was either clearly wrong or that he overlooked or misconceived material and relevant evidence in his denial of the defendant's motion for a new trial. See

Gonzalez, 56 A.3d at 102; Ferreira, 21 A.3d at 367.  Accordingly, it is our judgment that the trial justice properly denied the defendant's motion for a new trial.

**V**

**Conclusion**

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record in this case may be remanded to that tribunal.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**       State v. John H. Silva.

**CASE NO:**       No. 2011-378-C.A.
                   (P2/10-979 AG)

**COURT:**       Supreme Court

**DATE OPINION FILED:**   February 3, 2014

**JUSTICES:**       Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**       Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**   Providence County Superior Court

**JUDGE FROM LOWER COURT**:

                   Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

                   For State:   Christopher R. Bush
                           Department of Attorney General

                   For Defendant:  Lara E. Montecalvo
                           Office of the Public Defender