**Supreme Court**

No. 2015-27-C.A.

(P1/09-2498A)

State                                  :

v.                                  :

Erwin Grantley.                    :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                    :

v.                                    :

Erwin Grantley.                          :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.**  On May 3, 2012, a Providence County Superior Court jury found the defendant, Erwin Grantley (Grantley or defendant) guilty of one count of assault with a dangerous weapon in a dwelling house (domestic), in violation of G.L. 1956 § 11-5-4 and G.L. 1956 § 12-29-2(a)(2); guilty of one count of breaking and entering of a dwelling house (domestic), in violation of G.L. 1956 § 11-8-2 and § 12-29-2(a) and (b);[1] not guilty of one count of driving a motor vehicle without the consent of the owner, in violation of G.L. 1956 § 31-9-1; and not guilty of larceny under $500 in violation of G.L. 1956 § 11-41-1.

On September 6, 2013, the trial justice sentenced Grantley.  With respect to the assault with a dangerous weapon conviction, defendant was sentenced to thirty-two years, with sixteen years to serve and sixteen years suspended with probation.  For the breaking and entering conviction, Grantley was sentenced to fifteen years to serve, to be served consecutive to the assault sentence.  The trial justice also sentenced Grantley as an habitual criminal, per G.L. 1956 § 12-19-21, to an additional eight years, to run consecutively to these two sentences.

---

[1] The phrase "domestic" after the first two counts denotes that the state characterized the relationship between the complaining witness and defendant as "domestic" pursuant to the Domestic Violence Prevention Act.  See G.L. 1956 § 12-29-2.

On appeal, defendant raises three issues. With respect to the breaking and entering count, Grantley argues that the trial justice erred in denying his motion for a judgment of acquittal brought pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure and his motion for a new trial brought pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. Specifically, he asserts that the state failed to meet its burden of proving lack of consent because he had implied consent to enter the complaining witness's home. The defendant also contends that the trial justice erred in denying his motion for a new trial on the first count, assault with a dangerous weapon in a dwelling house. He maintains that the verdict on that count was against the weight of the evidence. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

The defendant's conviction arose out of an incident between defendant and the complaining witness, Crystal Bruce (Bruce), on the morning of May 28, 2009. The defendant was subsequently charged with the aforementioned counts, and a jury trial was held in the Providence County Superior Court on April 24 through May 3, 2012. Below, we summarize the relevant testimony adduced at trial.

Bruce, the first witness to testify, discussed her relationship with defendant that began in 2004. She described it as "on again, off again," noting that "it was good, but then it was bad, it was like a Dr. Jekyll and Mr. Hyde relationship." Bruce testified that she and Grantley often fought; and, when asked if any of the fights were physical, she replied "yes." During the course of their association, Bruce noted, she moved to 134 Houston Street in Providence in December 2007 and Grantley lived with her for about eight months. Grantley's name was placed on the

mailbox when they moved in together, and his name remained there through the date of the incident. Around the summer of 2008, Bruce ended her relationship with defendant. She stated that she returned the engagement ring Grantley gave her to the store and kept the money. However, Bruce and Grantley remained friends and attempted to improve their relationship.

In her testimony, Bruce discussed the days leading up to the incident. She said that she saw Grantley two days before, when she gave him a ride to fill out a job application. That day, Grantley wanted to go back to her house to see her dogs, but she refused. Also during the week before the incident, Bruce stayed overnight at defendant's home. She acknowledged that she slept with Grantley, but she stated that it was because she "didn't want to hate him or be enemies with him."

At the time of the incident, Bruce still resided at 134 Houston Street with her four children. She testified that she arrived home at 8:30 a.m., after spending the night at a male friend's house in Connecticut. Upon entering her bedroom, Bruce saw Grantley come in and shut the door behind him. She said that she did not know Grantley was at her house, she did not invite him there, and he did not have a set of keys to the house. After closing her bedroom door, Grantley questioned Bruce about her whereabouts the night before, and "[h]e just said if I was going to be a whore, it wasn't going to be while he was around." Bruce testified that defendant then punched her and she fell towards the bed. Grantley began choking Bruce and told her, "[I]f he couldn't have [her], wasn't nobody else going to have [her]." Before passing out, Bruce asked, "You're going to kill me with my kids upstairs?" She testified that she awoke to find Grantley holding a wire around her neck, which she managed to remove. She said that defendant then took her keys and cell phone and left.

Bruce testified that two of her children, Christopher and Jonathan, were home at the time of the incident.[2] She screamed for her sons and made her way toward their rooms. After she told them what had happened, Christopher called 9-1-1. She was taken to Rhode Island Hospital, where she stayed for four days. Bruce said that she suffered from a collapsed lung, a stab wound, bleeding in her brain, and bruised ribs.

On cross-examination, Bruce was asked about an IRS check addressed to Grantley that she received while he was in prison. Bruce testified that she sent the check to defendant in prison, he signed it, sent it back to her, and after cashing it, she ultimately used the check's proceeds. When Bruce talked with an investigator working for defendant's attorney, however, she told him that she deposited the check into Grantley's account. In her testimony, Bruce acknowledged lying to the investigator because she "was tired of speaking to [him]."

Bruce was also questioned about other letters she had written to Grantley while he was in prison. In the letters, she called herself defendant's "wife," and said, "I want you home with me where you belong," "I want to be your wife more than anything in this world," and "I just really wish I could have your baby, our baby." Bruce testified that she and Grantley were still trying to work on their relationship at the time she wrote the letters.

The state also presented Paul Casey, an EMT for the City of Cranston who responded to Bruce's home after the incident.[3] Casey testified that, upon arrival, Bruce was conscious and alert and appeared panicked and anxious. He stated that Bruce informed him that she had been

---

[2] To avoid confusion with Crystal Bruce, we will refer to Christopher Bruce and Jonathan Bruce by their first names. No disrespect is intended.

[3] Under a "statewide mutual aid pact," Casey, although an EMT for the City of Cranston, was dispatched to the City of Providence to "mutually aid the City of Providence."

assaulted and stabbed.[4]  Casey testified that Bruce's left eye was swollen shut, she had a laceration on her cheek, multiple ligature marks, and signs of blunt trauma on her arm and torso.

Bruce's sons, Christopher and Jonathan, each testified.  At the time of the incident, both were at home sleeping.  They testified that they were awakened by their mother.  Christopher helped his mother onto the bed and called 9-1-1.  After his mother told him what happened, Jonathan said, he looked outside of his bedroom window and saw Grantley driving away in Bruce's vehicle.

Jonathan also testified that on the day of the incident, he found a knife blade wrapped in a bloody towel underneath his mother's bed.  After finding it, he called the investigating detective. Jonathan testified that the detective came "right over"; however, on cross-examination, he said that the police did not retrieve the towel and the knife until June 1, 2009.  He acknowledged that he was originally mistaken about the date.  When asked whether he recalled defendant being at his house the day before the incident and whether defendant left that day, Jonathan responded affirmatively.  Both Christopher and Jonathan were also asked if they invited Grantley to the house, if he had permission to be at the house the day of the incident, and if they knew he was in the house on that date.  They testified in the negative to each.

Jay Baruch, M.D., an emergency room physician at Rhode Island Hospital, testified next.[5]  Doctor Baruch was working when Bruce came in and was part of her treatment team.  He testified that, when he initially saw her on May 28, 2009, there was concern that Bruce's condition was life-threatening.  Doctor Baruch testified that Bruce had a "potential stab wound to the chest."  After reviewing the medical records, Dr. Baruch stated that Bruce had abrasions and

---

[4] At trial, Bruce responded "No," when asked if she saw Grantley stab her.
[5] Doctor Baruch acknowledged that he was testifying from the medical records, not from his own memory.

tenderness on her face, redness around her neck, a penetrating wound in her left chest, a collapsed lung, and bleeding in her brain. He testified that she was discharged on May 31, 2009.

Three members of the Providence Police Department also testified: Det. Robert Firth, Det. Ralph Constantino, and Officer Jose Deschamps. Detective Firth and Officer Deschamps arrived at the scene around 9:30 a.m. on May 28, 2009. Detective Firth said that he walked around the residence, searched its interior, and photographed "any items of interest." Detective Firth noted that the search was limited because there was uncertainty about whether the residence could be searched without a warrant.[6] In his search, Det. Firth did not look under Bruce's bed and did not locate a weapon. Detective Firth was asked about the towel seen in one of his photographs, and if he noticed a weapon in it, to which he replied, "no." Detective Firth also responded in the negative when asked whether he disturbed the towel and whether he would have seen the knife in it without moving the towel. In his testimony, Det. Firth said that he did not fingerprint any area of the bedroom, the doors, or the windows.

Both Det. Firth and Officer Deschamps then went to Rhode Island Hospital. Upon arrival, Det. Firth testified that he photographed Bruce and seized the clothing she was wearing when she arrived. In Officer Deschamps's testimony, he said that he took Bruce's statement and completed a domestic violence form based on what Bruce told him. Officer Deschamps stated that Bruce told him Grantley stabbed her.

Detective Constantino testified that on June 1, 2009, he was called to respond to 134 Houston Street because a knife had been discovered. He testified that the knife blade was located in a towel when he seized it, but the knife's handle was not located. Detective

---

[6] Specifically, the scope of the search was initially limited to "inspection of the rooms and any places where a person may be hiding." The scope was limited because, at the time, it was unknown whether defendant had constitutional standing to contest a warrantless search.

- 6 -

Constantino stated that there was a substance on the blade consistent with blood, but that he did not test the substance or fingerprint the knife.

At the close of the state's case, defendant moved for a judgment of acquittal on all counts pursuant to Rule 29. The defendant argued that the state had introduced insufficient evidence to sustain a conviction on each count. With respect to count 1, assault with a dangerous weapon in a dwelling house, defendant asserted that Bruce and her sons were not credible witnesses. He also argued that the knife blade and towel may have been tampered with and had been subject to a "bad chain of custody." Regarding count 2, breaking and entering of a dwelling house, defendant contended that there was no evidence of forced entry or physical evidence showing that he was in Bruce's home during the incident. Additionally, defendant argued that he had permission to be in Bruce's home based on her testimony that "she had sex with him two days earlier" and Jonathan's testimony that defendant was at the house the day before the incident.

After reviewing the evidence in the light most favorable to the state, the trial justice found sufficient evidence for a jury to find defendant guilty and denied his motion for a judgment of acquittal. The trial justice noted that "[t]he credibility of the witnesses or the weight of the evidence is not before the Court at this point in time."

The defendant then called one witness, Robert Clancy, a deputy warden at the Department of Corrections. He testified about the policies and procedures when a check is sent to an inmate at the Adult Correctional Institutions. Deputy Clancy said that inmates were not allowed to receive checks. If a check were sent to an inmate, however, the inmate would be asked to sign it, and it would be deposited into the inmate's account. Despite this procedure, Deputy Clancy acknowledged that a check could get past authorities and to an inmate. At the

conclusion of his case, defendant renewed his motion for a judgment of acquittal on all counts pursuant to Rule 29. The trial justice reserved deciding the motion.

On May 30, 2012, after the jury verdict of guilty on two counts, the trial justice heard the parties on defendant's renewed motion for a judgment of acquittal and his motion for a new trial, which was filed on May 11, 2012. The defendant contended that the only evidence supporting the breaking and entering charge was that he did not have verbal permission to be at Bruce's home. He argued that a verbal invitation is not needed in certain relationships, such as in Grantley and Bruce's case; rather, consent is implied. The defendant then challenged the credibility of Bruce and her sons, Christopher and Jonathan, and he noted inconsistencies in their testimony.

In deciding the motion for a judgment of acquittal, the trial justice summarized the testimony presented at trial. She concluded that the testimony showed defendant lacked Bruce's permission to enter her home. The trial justice did not find that Grantley and Bruce's relationship effectively gave him permission to enter her household. With respect to the charge of assault with a dangerous weapon in a dwelling house, the trial justice found that there was sufficient evidence showing defendant's intent to kill Bruce. Specifically, she considered the testimony as to the severity of Bruce's injuries and Bruce's testimony that defendant told her, "[I]f he couldn't have [her], wasn't nobody else going to have [her]." Accordingly, the trial justice denied defendant's motion for a judgment of acquittal with respect to both convictions.

The trial justice then analyzed defendant's motion for a new trial.[7] She considered the witnesses' credibility and found Bruce credible. The trial justice noted that "[Bruce] did not try to embellish anything with respect to what happened with her * * * ." She concluded that, based

---

[7] Having reviewed all of the facts in her judgment of acquittal ruling, the trial justice did not summarize the testimony again in deciding defendant's motion for a new trial.

- 8 -

on the medical evidence concerning Bruce's injuries and the credible testimony of the state's witnesses, the court would have reached the same result as the jury. The trial justice found that the jury carefully deliberated, as illustrated by the verdicts of not guilty on two counts. Accordingly, the trial justice denied defendant's motion for a new trial.[8]

On appeal, defendant argues that the trial justice erred in denying his motion for a judgment of acquittal and motion for a new trial with respect to the count of breaking and entering of a dwelling house. Both arguments relating to the breaking and entering count rest on the same ground: defendant had implied consent to be in Bruce's household. The defendant also contends that the trial justice erred in denying his motion for a new trial on the count of assault with a dangerous weapon in a dwelling house. He argues that the state failed to establish essential elements, namely that he was the perpetrator of Bruce's stab wound and that he acted with the intent to kill Bruce.

## II

### Standard of Review

"When faced, as here, with both Rule 29 and Rule 33 motions, 'this Court first conducts a review of the new-trial motion.'" State v. Fleck, 81 A.3d 1129, 1133 (R.I. 2014) (quoting State v. Gaffney, 63 A.3d 888, 893 (R.I. 2013)). This is due to the different standards with which the

---

[8] Subsequently, defendant filed a second motion for a new trial, based on newly discovered evidence. He argued that over twenty newly discovered romantic letters written to him by Bruce in 2008, would have impeached her credibility because, at trial, Bruce stated that the two introduced letters were isolated and taken out of context. On July 30, 2013, the trial justice heard the parties and denied Grantley's motion. She determined that the letters were not newly discovered evidence because: (1) they existed at the time of the trial and defendant knew of their existence and location; (2) they were discoverable prior to the trial in the exercise of due diligence, yet defendant did not discuss the letters with his attorney or investigator until posttrial; (3) even if newly discovered, the letters were cumulative to the issue of Bruce's credibility; and (4) the letters would not have changed the verdict because the convictions were for "a vicious assault," in which the letters played no part.

trial justice decides each motion. When considering a Rule 29 motion for a judgment of acquittal, the trial justice "must view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw[ing] therefrom all reasonable inferences consistent with guilt." State v. Cardin, 987 A.2d 248, 250 (R.I. 2010) (quoting State v. Caba, 887 A.2d 370, 372 (R.I. 2005)). In deciding a Rule 33 motion for a new trial, however, "the trial justice places himself or herself in the role of a 'thirteenth juror' and then exercises his or her independent judgment as to the credibility of the witnesses and the weight of the evidence." State v. Matthews, 111 A.3d 390, 398 (R.I. 2015). Under a Rule 33 analysis, "the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." Matthews, 111 A.3d at 398 (quoting State v. Hie, 93 A.3d 963, 974 (R.I. 2014)).

Consequently, "a defendant has a higher hurdle to overcome when arguing a Rule 29 motion for judgment of acquittal than when he seeks to prevail on a Rule 33 motion for new trial * * * ." Fleck, 81 A.3d at 1133. "[U]nless a defendant can show that the presented evidence failed to support his or her conviction upon the motion-for-a-new-trial standard, a defendant necessarily will be unable to establish he or she was entitled to a judgment of acquittal." Id. (quoting State v. Pineda, 13 A.3d 623, 640 (R.I. 2011)). Thus, we will begin our review with defendant's motion for a new trial on the breaking and entering count.

When reviewing a trial justice's decision on a motion for a new trial, "[w]e accord great deference * * * 'because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses.'" State v. Florez, 138 A.3d 789, 794-95 (R.I. 2016) (quoting State v. Whitaker, 79 A.3d 795, 804

- 10 -

(R.I. 2013)). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." Id. at 793 (quoting State v. Bunnell, 47 A.3d 220, 233 (R.I. 2012)).

## III

## Analysis

## A

## New Trial on the Breaking and Entering Count

The defendant argues that the trial justice erred in denying his motion for a new trial on the breaking and entering count because the state failed to prove beyond a reasonable doubt that he lacked consent to enter Bruce's house. Specifically, defendant argues that he had implied consent to enter Bruce's home because "consent to enter the dwelling of another can be implied by a close and continuing familial relationship in circumstances where the parties' practice reveals permission to enter." To support his proposition that he and Bruce shared such a relationship, defendant notes that he once lived at 134 Houston Street with Bruce, his name was still on the mailbox on the incident date, Bruce wrote to him "exclaiming her love," and she slept at his residence a few days before the incident.

The defendant asks this Court to recognize implied consent in this case and references two states that have adopted such a defense.[9] We decline his request. Rather, we agree with the

---

[9] The defendant references Indiana and North Carolina as two states recognizing implied consent. See McKinney v. State, 653 N.E.2d 115, 118 (Ind. Ct. App. 1995) ("Lack of consent is not an element of the offense the State is required to prove. Rather, it is the defendant who must claim and prove the defense of consent."); State v. Tolley, 226 S.E.2d 672, 674 (N.C. Ct. App. 1976) ("A person entering a residence with the good faith belief that he has the consent of the owner or occupant or his authorized agent is not chargeable with the offense of breaking and entering.").

state that it is unnecessary to recognize such a defense because, under Rhode Island's breaking and entering statute, a defendant is free to argue that he had consent to enter the household. The statute, § 11-8-2(a), states, in relevant part, "Every person who shall break and enter at any time of the day or night any dwelling house or apartment * * * without the consent of the owner or tenant of the dwelling house, apartment, building, or garage, shall be imprisoned * * *." In this regard, we held in State v. Ranieri, 560 A.2d 350, 352 (R.I. 1989), that the state meets its burden by establishing a prima facie case that the defendant entered the dwelling without consent. The burden of production then shifts to the defendant to show that his entrance was with permission. Id. Ultimately, as with all elements of the offense, the state must prove lack of consent beyond a reasonable doubt. Id.

While proof of verbal permission to enter may be one way to show consent, this Court has not explicitly stated that it is the only way to do so. In State v. Dyer, 813 A.2d 71, 75 (R.I. 2003), we concluded that "the evidence was sufficient to support beyond a reasonable doubt a finding that [the] defendant did not have permission to enter complainant's apartment * * *." In reaching this conclusion, this Court looked at the entirety of the case's facts, not solely whether the defendant had verbal permission to enter. Id. at 75-76. For example, we considered that the defendant maintained his own apartment, had not lived with the complaining witness for about one year, kept no toiletries or clothes at her apartment, and did not have an "unlimited right of entry" because his key was restricted to when he babysat. Id. at 76; see State v. Karngar, 29 A.3d 1232, 1234-36 (R.I. 2011) (concluding that sufficient evidence supported the verdict that the defendant broke and entered into the apartment of his on-again, off-again girlfriend, despite their three-year relationship, the defendant's assertion that he had a key to her apartment, and the defendant's testimony that she invited him over that night). Similarly here, we are satisfied that

- 12 -

sufficient evidence exists showing that Grantley lacked consent to enter Bruce's home. In addition to Bruce and her sons' testimony that defendant did not have permission, other evidence supports this finding. As in Dyer, defendant had his own apartment at the time of the incident, did not live with Bruce, and did not have keys to her home.

We are satisfied that the trial justice properly decided defendant's motion for a new trial with respect to all of the elements of the breaking and entering count. She set out the standard for deciding a Rule 33 motion and summarized the testimony adduced at trial. The trial justice then reviewed the breaking and entering charge, noting, "there was no question * * * under the instructions that this Court gave the jury that no violent break has to be proven by the State."[10] She considered that all three witnesses who lived at the house testified that defendant did not have permission to be there at the time of the incident, and no one invited him into the house. The trial justice addressed defendant and Bruce's relationship, including their recent encounter a few nights before the incident, and determined, "I don't think that gives anybody permission to go in your house without any permission at the time." She then evaluated the witnesses' credibility and deemed Bruce to be a credible witness. She found that Bruce did not exaggerate or embellish in many instances where she could have. The judge considered the credibility issues raised by the IRS check and the ongoing nature of Bruce's relationship with defendant, but she determined that it did not significantly impact her credibility. The judge also found the testimony of Christopher, Jonathan, and the police officers credible. Thus, we conclude that the

---

[10] On the issue of consent, the trial justice, without objection, instructed the jury, "In order to satisfy the [lack of consent] element, the State must prove the defendant did so without the consent of the owner of the premises in this case. That would be Crystal Bruce. You must determine from the evidence you received whether this has been proven to you from all the facts and circumstances that have been presented to you."

trial justice properly denied defendant's motion for a new trial with respect to the breaking and entering count.

"[H]aving concluded that the evidence 'was sufficient to withstand the more stringent review applicable to a motion for a new trial, it follows that the evidence was also sufficient to withstand a motion for a judgment of acquittal.'" State v. Cardona, 969 A.2d 667, 674 (R.I. 2009) (quoting State v. Hesford, 900 A.2d 1194, 1200 (R.I. 2006)). Accordingly, we affirm the trial justice's denial of defendant's motion for a judgment of acquittal as to the breaking and entering count.

**B**

**New Trial on the Assault with a Dangerous Weapon Count**

The defendant appeals the trial justice's denial of his motion for a new trial with respect to the count of assault with a dangerous weapon in a dwelling house.[11] He argues that the state failed to establish key elements of the offense—specifically, that he was the cause of Bruce's stab wound and that he acted with the intent to kill her.[12] The defendant challenges Bruce's credibility by noting the IRS check and inconsistencies in her testimony. He asserts that, after Bruce's credibility was weakened, the state failed to produce evidence responding to the credibility challenges. The defendant argues that, because the two inferences made in finding him guilty—that he was the perpetrator of Bruce's stab wound and that he possessed the intent to kill her—were based on Bruce's incredible testimony, the state had to put forth corroborating evidence. The defendant also contends that the state failed to meet its burden because of the

---

[11] On appeal, defendant did not challenge the denial of his motion for a judgment of acquittal with respect to this count.
[12] The assault with a dangerous weapon in a dwelling house statute reads, in pertinent part, "Whoever, being armed with a dangerous weapon, assaults another with intent to rob or murder, shall, if the assault is committed within a dwelling house, be punished by imprisonment * * * ." G.L. 1956 § 11-5-4.

lack of forensic evidence, noting "[t]he police did not attempt to develop fingerprints from the knife they collected days later, nor did they have DNA analysis of the blood on various articles of clothing and the knife."

The defendant's arguments hinge on his disagreement with the trial justice's credibility determinations.[13] However, this Court has long held that "[t]he mere fact that [a] defendant disagrees with the trial justice's conclusions about credibility is not a sufficient basis to warrant the granting of a motion for [a] new trial." State v. Virola, 115 A.3d 980, 993 (R.I. 2015) (quoting State v. Silva, 84 A.3d 411, 418 (R.I. 2014)). Because "[t]his Court affords a 'substantial amount of deference to [the] determinations' of the trial justice with respect to credibility of the witnesses," we will not overturn a trial justice's decision unless she was clearly wrong or overlooked or misconceived material evidence. Silva, 84 A.3d at 417 (quoting DeCiantis v. State, 24 A.3d 557, 572 (R.I. 2011)).

Here, we are convinced that the trial justice properly analyzed the motion for a new trial and did not overlook or misconceive material evidence. As discussed above, the trial justice assessed and made conclusions as to the witnesses' credibility. She found Bruce credible and did not find the attacks against her credibility, namely the IRS check incident and the "on again, off again" nature of her relationship with Grantley, to "significantly impact[] her credibility." The trial justice also addressed the lack of forensic evidence and expressed her disappointment with the police's investigation, stating, "I don't care whether they had somebody identify this [d]efendant or not; they had many opportunities to properly seize and observe the crime scene."

---

[13] In his brief, defendant discusses, at length, presumptions, inferences, the burden of proof, and the burden of persuasion to support his argument that the verdict was against the weight of the evidence. The crux of defendant's assertion that the "conviction should not stand" because "the credibility of [the state's] crucial complaining witness was undermined" is really a disagreement with the trial justice's credibility determination.

Although a better police investigation "would have made the case stronger," the trial justice did not find that it affected the case because "[o]ne witness * * * is enough to convict a [d]efendant if there's belief."

In deciding defendant's motion, the trial justice determined that there was no question whether Bruce was assaulted; however, the issue "was whether * * * [d]efendant was the one that actually did it." She addressed defendant's argument that there was insufficient evidence proving he was the cause of Bruce's stab wound, finding: "There was no one else in the house to assault her and no mysterious one-armed man that is being accused of doing this. He was the only one in the house doing this. He was assaulting her. He was there when she woke up stabbed and bleeding." The trial justice also found sufficient evidence showing defendant's intent to murder Bruce. In arriving at this conclusion, she discussed the severity of Bruce's injuries, including the stab wound in her chest, ligature marks, a collapsed lung, and bleeding in her brain. The trial justice also considered Bruce's testimony that defendant told her, "if he couldn't have [her], wasn't nobody else going to have [her]." In light of her analysis, the trial justice determined that she would not have reached a different verdict than the jury and denied defendant's motion for a new trial.

After reviewing the record, this Court concludes that the trial justice did not overlook or misconceive material evidence and was not clearly wrong. In conducting her analysis, she considered the evidence, assessed the witnesses' credibility, and determined that she would not have reached a different result than the jury. As such, she properly denied the defendant's motion for a new trial with respect to the charge of assault with a deadly weapon in a dwelling house.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

The materials associated with this case may be remanded to that tribunal.



Justice ⚓ Independence ⚓ Honor

# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## Clerk's Office Order/Opinion Cover Sheet

**TITLE OF CASE:**  State v. Erwin Grantley.

**CASE NO:**  No. 2015-27-C.A.
     (P1/09-2498A)

**COURT:**  Supreme Court

**DATE OPINION FILED:** November 28, 2016

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**  Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:** Providence County Superior Court

**JUDGE FROM LOWER COURT**:

    Associate Justice Susan E. McGuirl

**ATTORNEYS ON APPEAL:**

    For State: Lauren S. Zurier
       Department of Attorney General

    For Defendant: George J. West, Esq.